**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TOM WENCKAITIS and ANTHONY MARSHALL, | ) ) ) | |
| | ) | Case No. 20-cv-03743 |
| Plaintiffs, | ) ) | Judge Sharon Johnson Coleman |
| v. | ) ) | |
| SPECIALTY CONTRACTORS, INC. and, JOHN O'HARA, owner of Specialty Contractors, Inc., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Tom Wenckaitis and Anthony Marshall[1] filed this suit against Specialty

Contractors, Inc. ("Specialty") and John O'Hara alleging violations of the Fair Labor Standards Act

("FLSA"), Illinois Minimum Wage Law ("IMWL"), Illinois Employment Classification Act

("IECA"), and the Illinois Wage Payment & Collection Act ("IWPCA"). The parties tried this case

before the Court in a two-day bench trial on April 6, 2022 and April 7, 2022. This Memorandum

Opinion and Order sets forth the Court's findings of fact and conclusions of law as required under

Federal Rule of Civil Procedure 52(a). For the following reasons, the Court finds that Defendants

are joint and severally liable for their violations of the above statutes. The Court additionally finds

in Defendants' favor on their counterclaim against Wenckaitis for the retention of the flex fund

double payment and against Defendants on their remaining counterclaims.

**Background and Findings of Fact**

In examining Plaintiffs' claims and Defendants' counterclaims, the Court considered the

totality of the evidence presented at the bench trial, including the live testimony and the admitted

---

[1] Plaintiff Andrew Johnson accepted Defendants' Rule 68 Offer of Judgment on January 19, 2021.

exhibits. The Court further assessed the weight to be accorded to the evidence and the credibility of each witness. In determining credibility, the Court "must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity." *Khan v. Fatima,* 680 F.3d 781, 785 (7th Cir. 2012).

Defendant Specialty Contractors, Inc. ("Specialty") is a construction company that specializes in, among other things, electrical contracting. Defendant John O'Hara serves as Specialty's president and testified that it is a "one man show." O'Hara hired what he called trade and general contractors, negotiated their pay rates, and handled all other aspects of the business. At trial, O'Hara testified that electrical construction is not a large part of his business, however, through 2021 the Specialty website stated that business is "a fully licensed design build electrical contractor." (P Ex. 17.) He also testified that over ten individuals worked for Specialty as electrical contractors. Yet, O'Hara maintained that no one working for Specialty (including himself) was ever an employee.

Plaintiff Wenckaitis worked for Specialty between July 2018 and March 2020. Plaintiff Marshall worked for Specialty between February 2019 and March 2020. Both Plaintiffs testified that upon joining Specialty, they signed an Independent Contractor Agreement attesting that they were retained as independent contractors for various electrical construction projects. The Independent Contractor Agreement listed each Plaintiff's rate of pay. For Wenckaitis, his rate began at "$33.50 per hour (full Journeyman scale) plus $2.00 per hour retained in flex fund." (P Ex. 12.) Marshall started at $16.50 per hour with the same flex fund retention. O'Hara testified that the flex fund served as an added benefit to workers—if they completed their work without issue, O'Hara released the funds. Plaintiffs also testified that receipt of the flex fund was contingent upon satisfactory performance. The Independent Contractor Agreement, however, was silent as to the flex fund's purpose and terms. Plaintiffs' paystubs showed the flex fund amounts as a deduction from their

wages during each pay period.  For example, Wenckaitis' February 15, 2020 displayed his total wages ($3,514.50), subtracted the amount retained in the flex fund ($198.00), and added reimbursement of expenses ($80.00), resulting in his final pay ($3,396.50).  (P Ex. 8.)  O'Hara testified that the workers' paystubs listed the flex fund as a deduction to show workers how much they could expect to receive. Marshall and Wenckaitis received payment of their flex fund in 2020, but O'Hara accidentally paid Wenckaitis his flex fund twice.

At the time he joined Specialty, Wenckaitis had over 25 years of experience as an electrician. Marshall stated that he had little to no electrical experience before starting with Specialty.  He testified that he received some instruction at a trade school but not electrical training as he left the program after two months and before specialized instruction began.  He also received some degree of training by way of observation with a private contractor for pay, but his testimony on this point was unclear.  Defense counsel cross examined Marshall extensively on his electrical experience and Marshall frequently stated that he did not remember important issues relevant to the case, such as his prior work history.  But based on the timing between Marshall's departure from trade school and his introduction to O'Hara, the Court can reasonably infer that Marshall was early in his career when he joined Specialty, even if he received some pertinent job training.

Plaintiffs worked at a few job sites during their time with Specialty, primarily at Huntley Springs, a site in Carol Stream, and at various Harley Davidson locations.  At each location, Plaintiffs testified that a Specialty worker, Dave Coffey, supervised their work.  Coffey would assign Plaintiffs a task, such as running conduit to junction boxes, running wire to the same, or trimming switches.  Upon completion, Coffey gave each Plaintiff their next task, and the process continued. Additionally, Marshall testified that he worked under the direction of other Specialty electricians who instructed him on electrical work as he was inexperienced in the field.  O'Hara testified that he hired Coffey as a foreman to coordinate "sequencing" between trade contractors and general

contractors. However, O'Hara admitted that he was unaware of the specific directions Coffey would give workers as O'Hara did not frequently visit the job site.

Both Plaintiffs testified that they utilized Specialty materials on job sites, including ladders, drills, saws, heavy duty tools, and wiring pulling devices, all of which bore Specialty's name. Plaintiffs brought their own hand tools and Wenckaitis used his own band saw. At times, Plaintiffs purchased materials for the jobs. O'Hara testified that he permitted the workers to "mark up" those materials to make a profit, but added no details about how he permitted workers submit reimbursements for materials for an undetermined higher price to receive a profit.

Wenckaitis made contradictory statements as to whether he completed "side jobs" while working for Specialty. It was unclear whether he completed some additional work for family members or did contract work for other customers. Based on the contradictions, the Court assumes that he did some additional for-profit work while working at Specialty.

Once every two or three weeks, each Plaintiff entered his hours for each job site as well as any costs for gas or materials for reimbursement on Specialty's "TM Portal." Plaintiffs introduced the TM Portal records at trial, which showed the number of hours submitted by each Plaintiff per pay period. (P Ex. 8–9.) Wenckaitis testified that after each shift, he wrote down his hours in a separate notebook, which he also presented at trial. (P Ex. 19.) Marshall similarly kept track of his hours in his cell phone, but after receiving payment for his hours, Marshall deleted his records. John O'Hara testified that he did not otherwise keep track of Plaintiffs' hours and that he did not cross-check TM Portal submissions with any other records.

Defendants argued at trial that Plaintiffs' TM Portal submissions did not accurately reflect the number of hours Plaintiffs worked. O'Hara testified that he implemented a five-for-eight rule to overcompensate for Saturday work. O'Hara stated that he told Plaintiffs to work five hours on Saturdays but enter eight hours into the portal, in effect paying Plaintiffs over 150 percent of their

regular pay on Saturdays. At one point, O'Hara contends that he called Marshall to ensure that Marshall billed in accordance with the five-for-eight in his June 15, 2019 paycheck and O'Hara adjusted Marshall's hours to compensate him. As a result, O'Hara maintained that he paid Plaintiffs overtime wages and that the TM Portal shows billed hours, which are higher than hours worked. O'Hara also testified that he expected Plaintiffs to "apply the logic" of the five-for-eight rule to all other overtime. Therefore, if a worker billed more than forty hours in a week, that worker should have billed for 150 percent of their time for all hours worked over forty per week, regardless of the day of the week worked. Only O'Hara testified to the existence of the rule—Defendants supplied no evidence that either Plaintiff submitted 1.5 times their hourly rate for non-Saturday hours.

Plaintiffs admitted that O'Hara informed them of the five-for-eight rule, however, they stated that they worked more than five hours on Saturdays. Both Plaintiffs testified that they began work at 7:00 a.m. on Saturdays and ended by 1:00 p.m. or 2:00 p.m. Neither testified that they took any extended breaks on Saturdays. If this were true, Plaintiffs worked six or seven hours on Saturdays. If they billed for eight hours, they received less than 1.5 times their normal pay. Defense counsel attempted to impeach Wenckaitis on this assertion with testimony from Wenckaitis' deposition that he was paid eight hours for five hours work on Saturdays. Yet, in the same line of deposition questioning, Wenckaitis also stated that he worked from 7:00 a.m. to 1:00 or 2:00 p.m. on Saturdays. Wenckaitis' statements are inherently contradictory, but they are contradictions he made at the time of his deposition and therefore the impeachment was not successful. Regardless, Wenckaitis' contemporary time logs support the conclusion that he worked more than five hours at least on some Saturdays. For example, on Saturday February 15, 2020, Wenckaitis recorded six hours "O.T." and on February 22, 2020, he recorded six-and-a-half-hours "O.T." (P Ex. 19.) This evidence corroborates Wenckaitis' testimony that he worked at least six hours on Saturdays because labeling his hours as "O.T." indicates that they were hours worked, not hours billed.

5

Further, Plaintiffs testified that they never billed for more time than they worked on any day

other than Saturday.  Neither Plaintiff stated that they had any familiarity with this general overtime

pay rule.  Rather, Plaintiffs testified that in early 2020, they complained to John O'Hara's son that

they did not receive overtime pay.  Thereafter, Wenckaitis started to mark overtime as "O.T." in his

handwritten logs and Plaintiffs submitted overtime hours as separate entries through the TM Portal.

In March 2020, Plaintiffs' relationship with Specialty ended due to the global health crisis

related to the COVID-19 virus.  As a result, Wenckaitis was unemployed for two weeks while

Marshall remained unemployed for 23 weeks.  Because Plaintiffs were classified as independent

contractors by Specialty, their applications for unemployment benefits were denied, as corroborated

by the benefit denial letters Plaintiffs received from the Illinois Department of Employment Security

("IDES").  (P Ex. 25–26.)  Plaintiffs also introduced the IDES Weekly Benefit Table for 2020 to

show that Wenckaitis would have received $669 per week and Marshall would have received $484

per week in unemployment benefits.  (P Ex. 6.)  Neither Plaintiff appealed the result of their

unemployment benefits application, and neither applied for unemployment benefits under the

CARES Act.  Upon parting from Specialty, O'Hara paid Wenckaitis $938 and Marshall $792 as what

O'Hara classified as an advance.  O'Hara testified that he intended to create good will with the

workers to ensure they returned to work after the global health crisis resolved, so he paid the

workers as though they had completed the full week's work.

**Legal Standard**

When an action is "tried on the facts without a jury," the district court must "find the facts

specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  Also under Rule 52(a),

"the judge must indicate the reasoning process that connects the evidence to the conclusion."  *Zhao

v. United States*, 963 F.3d 692, 700 (7th Cir. 2020) (citation omitted).  While the district court "need

not address each piece of evidence, the court must include sufficient subsidiary facts so that [the

Seventh Circuit] can clearly understand the steps by which it reached its ultimate conclusion." *Xodus v. Wackenhut Corp.*, 619 F.3d 683, 686 (7th Cir. 2010).

## Discussion and Conclusions of Law

### I. Employment Status

Defendants' liability under the FLSA, IMWL, IECA, and IWPCA turns on whether Specialty was Plaintiffs' employer or whether Plaintiffs served as independent contractors. Beginning with the FLSA and IMWL,[2] Plaintiffs "bear[ ] the burden of establishing that [they] performed work for an employer and [are] therefore entitled to compensation." *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016) (internal citation omitted). The FLSA defines an employer as "an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 203(d). An employee is "any individual employed by an employer." *Id.* § 203(e)(1). The term is intended to be interpreted as "broad and comprehensive in order to accomplish the remedial purposes of the Act." *Sec'y of Labor, U.S. Dep't of Lab. v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). "Because status as an 'employee' for purposes of the FLSA depends on the totality of the circumstances rather than on any technical label, courts must examine the 'economic reality' of the working relationship between the alleged employee and the alleged employer to decide whether Congress intended the FLSA to apply to that particular relationship." *Berger*, 843 F.3d at 290 (cleaned up). Therefore, the fact that Plaintiffs signed an Independent Contractor Agreement is not dispositive of their employment status. *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 665 (7th Cir. 2022) ("[The] terms of a contract do not control the employer-employee issue under the [FLSA].").

The Seventh Circuit uses the following six-factor test to determine "whether economic reality indicates a worker is an employee:"

---

[2] The employee/employer analysis is the same under the FLSA and IMWL. Ill. Admin. Code tit. 56 §§ 210.110, 210.120; *Compton v. DuPage Cnty. Health Dep't.*, 426 F. Supp. 3d 539, 550–51 (N.D. Ill. 2019) (Shah, J.).

1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4) whether the service rendered requires as special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* (quoting *Lauritzen*, 835 F.2d at 1535).

A. <u>Control</u>

"One way to understand [the control] factor is to ask whether the worker has control over such a meaningful portion of his labor that he operates as a separate economic entity, i.e., as an independent contractor." *Id.* at 666. First, Defendants explicitly pled in their answer that "plaintiffs generally worked under the direction and control of Specialty Contractors, Inc. and the general contractors on various jobsites in question." (Dkt. 14 ¶ 13.) Such a judicial admission "may not be controverted at trial or on appeal." *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995).

In addition, the evidence at trial showed that Specialty retained control over Plaintiffs' work, even though Plaintiffs had some degree of control over the manner in which they completed projects. Wenckaitis and Marshall credibly testified that they performed services at the direction of Dave Coffey, a Specialty worker who served as supervisor and foreman. O'Hara contended that Coffey merely managed the "sequencing" of jobs at sites. But Plaintiffs credibly testified that Coffey set their arrival times and gave them specific tasks for each day. Once Plaintiffs completed a discrete task, Coffey assigned them their next job. Marshall additionally stated that he worked under the direction of other Specialty electricians who instructed him on electrical work as he was

inexperienced in the field. Marshall's testimony as to the breadth of his electrical experience prior to working with Specialty was hazy and the Court finds that he received some degree of related instruction before joining Specialty. But due to the timeline elicited at trial, Marshall was nonetheless early in his career and required guidance to perform the tasks assigned to him on Specialty job sites. In sum, this factor weighs in favor of Plaintiffs' status as employees due to Defendants' judicial admission and the credible evidence of Specialty's control over Plaintiffs' work.

B. <u>Profit and Loss</u>

The second factor assesses a worker's opportunity for profit or loss based on his or her skill. "The concept of profit and loss, i.e., the ability to generate an unlimited amount of revenue in excess of expenses while risking that expenses might exceed revenues, is generally associated with the operation of an independent business." *Craig v. FedEx Ground Package Sys., Inc.,* 335 P.3d 66, 90 (Kan. 2014) (reviewing a question certified from the Seventh Circuit). Because Plaintiffs were paid by the hour, they had no opportunity for profit or loss based on their job performance. In addition, O'Hara's comments that Plaintiffs could have marked up the prices on materials for which they sought reimbursement do not change the analysis. There is no evidence that the parties negotiated a markup percentage and O'Hara offered no additional specifics about the limits of this practice. Simply put, there is no evidence that Plaintiffs were aware of or adopted this practice. Regardless, their hourly pay arrangement causes this factor to weigh in favor of an employee-employer relationship.

C. <u>Capital Investment</u>

As for capital investment, the evidence showed that Specialty supplied the majority of the necessary tools for Plaintiffs' work, including ladders, wiring devices, and other heavy-duty tools. Plaintiffs did testify that that they brought hand tools and Wenckaitis supplied a band saw. However, the capital investment factor refers to those "large expenditures, such as risk capital,

capital investments, and not negligible items or labor itself." *Lauritzen*, 835 F.2d at 1537 (quoting *Donovan v. Gillmor*, 535 F. Supp. 154, 161 (N.D. Ohio 1982)). Further, Plaintiffs sometimes purchased materials for their work but were reimbursed by Specialty—Plaintiffs were merely a means of delivery. Because Defendants provided the majority of the tools and materials necessary for Plaintiffs' work, this factor weighs in favor of an employment relationship.

D. <u>Degree of Skill</u>

The "degree of skill" factor gauges more than the abilities of Plaintiffs to perform their job successfully. Rather, Plaintiffs must possess "specialized skills that set the independent contractor apart from other workers." *Brant*, 43 F.4th at 671 (citing *Lauritzen*, 835 F.2d at 1537). Here, Wenckaitis testified that he had over 25 years of experience in electrical-related work and completed an apprenticeship program, though he argued that his work as an electrician did not apply to Specialty's electrical contracting business. Due to the length of his related experience, this factor weighs slightly in favor of an independent contractor arrangement as to Wenckaitis. Marshall attended a trade school for a brief amount of time, but provided evidence that he was not very experienced in electrical work and required further instruction on Specialty job sites. Therefore, this factor weighs in favor of an employment relationship as to Marshall.

E. <u>Permanency</u>

A longer relationship between the worker and a company weighs in favor of employment rather than independent contractor status. *See Lauritzen*, 835 F.2d at 1537. Because Plaintiffs each remained with Specialty for over one year, this factor weighs in favor of employment. *See Arunin v. Oasis Chicago, Inc.*, No. 14 CV 6870, 2016 WL 851989, at *4 (N.D. Ill. Mar. 4, 2016) (Coleman, J.)

F. <u>Integral Part of the Business</u>

O'Hara denied that electrical contracting constituted an integral part of Specialty's work. The trial evidence showed that Specialty held itself out as an electrical contracting company.

10

Through 2021, Specialty's website advertised that it served as an "Commercial, Industrial & Electrical" contractor. (P Ex. 17.) The website has a distinct "Electrical Division" section describing the types of electrical services it can provide. (*Id.*) And for the job sites where Plaintiffs worked, such as Huntley Springs, O'Hara testified that the client retained Specialty only as an electrical contractor. However, O'Hara attempted to minimize Specialty's electrical services by stating that the company mostly did "design build" work and that electrical work made up only 20 percent of the company's revenue. Even if electrical services were not the only service Specialty offered, the Court finds that it was a primary component of the business, and this factor weighs at least slightly in favor of the employment relationship.

Considering the totality of the evidence and the parties' arguments, the Court finds that Plaintiffs were the employees of Specialty under the FLSA and the IMWL. Almost all of the factors weigh in favor of this finding, and the Court particularly relies on the Defendants' admission in their answer that Plaintiffs worked under Specialty's direction and control.

The evidence likewise establishes an employment relationship under the IECA, which contains a rebuttable presumption that an individual working for a contractor is deemed to be an employee of that entity. 820 ILCS 185/10. Under the IECA, contractor is defined as "any sole proprietor, partnership, firm, corporation, limited liability company, association, or other legal entity permitted by law to do business in within the State of Illinois who engages in construction." 820 ILCS 185/5. To rebut the presumption of an employment relationship, a contractor may show that: the individual is free from the entity's control or direction over the performance of their work; the individual performs work outside the usual course of services provided by the contractor; and the individual has an independent trade, occupation, profession, or business; or the individual is a sole proprietor or partnership as defined elsewhere in the statute. 820 ILCS 185/10. The presumption of an employment relationship applies here as Specialty is an entity engaging in the construction

business in Illinois. And for the reasons just stated, the evidence showed that Plaintiffs were not free from Specialty's control or direction over the performance of their work. Therefore, Specialty cannot rebut the presumption.

Finally, Plaintiffs served as Specialty's employees under the IWPCA. Workers are protected under the IWPCA unless their work is free from the direction and control of the employer, they perform work outside the course of the employer's usual course of business (unless that employer is "in the business of contracting with third parties for the placement of employees"), and they are independently established. 820 ILCS 115/2. For the reasons just explained, Plaintiffs also fall under the classification of employee for the purposes of the IWPCA.

II.     *FLSA, IMWL, IECA, and IWPCA Violations and Damages*

Having found that Plaintiffs served as Specialty's employees, the Court now determines whether Specialty violated the FLSA, IMWL, IECA, and IWPCA.

A.  Overtime Wages

Under the FLSA, an employer must pay an employee at least 1.5 times the employee's regular rate for all hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The IMWL shares an overtime wage requirement. 820 ILCS 105/4. Under the FLSA, the "employee bears the burden of proving that she performed overtime work for which she was not properly compensated." *Brown v. Fam. Dollar Stores of IN, LP*, 534 F.3d 593, 594 (7th Cir. 2008). Where an employer did not keep up-to-date or accurate time records, as here, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). The burden then shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the

inference to be drawn from the employee's evidence." *Melton v. Tippecanoe Cnty.*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting *Anderson*, 328 U.S. at 687–88).

Plaintiffs' TM Portal submissions provide evidence that Plaintiffs worked over 40 hours per week at different times during while at Specialty. As to Wenckaitis, his records indicate that he worked over 80 hours in a two-week period or over 120 hours in a three-week period for the following pay periods: 12/3–12/14/18; 1/12–1/25/19; 1/26–2/8/19; 2/9–2/22/19; 2/23–3/8/19; 3/11–23/9/19; 8/31–9/13/19; 9/14–9/27/19; 9/28–10/11/19; 10/12–10/25/19; 2/15–2/28/20.[3] (P Ex. 8.) Marshall's records show that he worked overtime hours in the following pay periods: 6/1–6/15/19; 8/30–9/13/19; 9/14–9/27/19; 9/28–10/11/19; 10/12–10/25/19; 10/28–11/8/19; 1/13–2/1/20.[4] (P Ex. 9.) The difficult question, however, is whether these records reflect hours worked or hours billed.

The Court holds that Plaintiff have met their burden to show that they performed work for which they were not properly compensated by producing their TM Portal submissions. The burden therefore shifts to Defendants. Because O'Hara admitted that Specialty relied only on its workers to self-report their hours, Defendants can only meet their burden by providing evidence that negates the reasonableness of the inference to be drawn from Plaintiffs' evidence. *Melton*, 838 F.3d at 818. Defendants argued that Plaintiffs' records represent Plaintiffs' hours billed and not hours worked because Plaintiffs followed O'Hara's five-for-eight rule. For example, Specialty paid Wenckaitis 88 hours' pay for the pay period of 2/9/19 to 2/22/19. (P Ex. 8.) According to Wenckaitis' records, he worked eight hours per day for ten weekdays and one eight-hour Saturday. (P Ex. 19.)

---

[3] After Wenckaitis and Marshall complained in 2020 about their lack of overtime pay, they noted their overtime hours in TM Portal submissions and were paid 1.5 their hourly wage for those hours. Therefore, Wenckaitis worked overtime hours for which he was compensated during pay periods 2/3-2/14/20 and 3/2-3/13/20.
[4] For the same reason, Marshall was compensated for his overtime worked during pay periods 2/3-2/14/20 and 2/15-2/28/20.

Defendants argue that Wenckaitis billed eight hours on Saturday but only worked five in accordance with the five-for-eight rule. Therefore, he was compensated over 150 percent for his overtime hours. Wenckaitis testified at trial, however, that he did not follow the five-for-eight rule exactly; rather, he worked for six to seven hours on Saturdays. Therefore, even if he billed for eight hours of work, he did not receive 1.5 times his hourly rate.

Because Defendants can identify which Saturdays Wenckaitis worked (through Wenckaitis' own handwritten logs) and Wenckaitis admits that he billed for more hours than he worked on Saturdays, Defendants raised doubts about the reasonableness of the TM Portal submissions on their face. However, as explained in the Findings of Fact, Wenckaitis supplied sufficient evidence that he worked over five hours on Saturdays. In particular, Wenckaitis' time logs show that he worked six hours on February 15, 2020 and six-and-a-half hours on February 22, 2020. Because he listed this time as "O.T." (overtime), the Court concludes that they represent Wenckaitis' hours worked, not his hours billed. (*Id.*) Therefore, the Court does not conclude that Wenckaitis only ever worked five hours on Saturdays. At the same time, Wenckaitis' own testimony does not permit a finding that Wenckaitis worked eight hours on Saturdays. As a result, based on the totality of evidence presented, the Court reduces Wenckaitis' Saturday time submissions by 1.5 hours to account for the extra hours he billed.

As to Marshall, such a reduction for Saturday premium time is not warranted. Defendants attempted to rebut Marshall's overtime calculation by eliciting testimony from Marshall that there were some Saturdays for which he billed more than he worked (though Marshall also stated that he worked six or seven hours on Saturdays—not five). Unlike Wenckaitis, however, Marshall did not retain records showing during which weeks he worked on Saturdays and Defendants cannot show how many Saturdays Marshall worked and during which pay periods. Therefore, the Court does not limit his ability to recover all overtime hours listed in his TM Portal submissions. In some sense,

14

this is a peculiar outcome compared to Wenckaitis—Marshall is seemingly rewarded for not retaining more specific records. But this discrepancy exists because the Court attributes the lack of Marshall's time records to Specialty. *See Brown*, 534 F.3d at 595 ("[W]here an employer failed to keep the proper and accurate records required by the FLSA, the employer rather than the employee should bear the consequences of that failure."). Where the Court has access to documents that permit it to make more specific calculations, such as Wenckaitis' handwritten records, it must use those records to calculate the unpaid overtime hours as accurately as possible.

Finally, there is no evidence that Plaintiffs billed for more hours than they worked on weekdays. For non-Saturday overtime, O'Hara stated that he expected workers to "apply the logic" of the five-for-eight rule and bill 150 percent for all hours worked over forty per week. Defendants presented a spreadsheet[5] in which O'Hara adjusted Plaintiffs' hours, assuming that Plaintiffs billed for 150 percent of all overtime hours. For example, where Wenckaitis submitted 88 hours for a two-week period, O'Hara calculated that he must have only worked 85 hours and billed for 88 to receive overtime premium pay. Other than O'Hara's testimony that he expected his workers to implement this procedure, there is no evidence that Plaintiffs were aware of or adopted this rule. In addition, Plaintiffs stated that they complained to O'Hara's son in early 2020 about their lack of overtime pay. After that, Plaintiffs separately recorded their overtime hours in their TM Portal submissions and received premium pay. These events corroborate Plaintiffs' claims that they did not bill additional hours for general overtime or otherwise receive premium pay until after their complaints. Because Defendants did not meet their burden to rebut Plaintiffs' overtime calculations (except partially as relates to Saturday hours, as previously explained), the Court rejects O'Hara's

---

[5] This spreadsheet was not filed as a trial exhibit on the docket but can be found at Docket Entry 44-3.

calculations. Considering the above, the Court calculates that Specialty failed to pay Wenckaitis $1,612.01[6] in overtime premium pay.[7] Marshall is owed $1,896.67 in overtime premium pay.

Under the IECA, Plaintiffs can recover these unpaid overtime wages as well as an equal amount in liquidated damages. The FLSA likewise provides for "an additional equal amount" of unpaid overtime as liquidated damages. 29 U.S.C. § 216(b). "Under [the] FLSA, liquidated damages are mandatory, unless the trial court determines that the employer, while acting in good faith, *reasonably believed* that its conduct was consistent with the law." *Jackson v. Go-Tane Servs.*, 56 F. App'x 267, 273 (7th Cir. 2003) (emphasis added). Therefore, even if an employer acts with good faith, it must have reason to believe its actions were consistent with the law. *See Berger v. Perry's Steakhouse of Illinois, LLC*, 430 F. Supp. 3d 397, 408 (N.D. Ill. 2019) (Durkin, J.) (citing *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986)) ("The employer must take affirmative steps to ensure its FLSA compliance; it may not simply claim ignorance."). Good faith is an affirmative defense, which Defendants have pled. Defendants thus bear the burden to overcome the "strong presumption under the statute in favor of doubling [the damage award]." *Shea v. Galaxie Lumber & Const. Co.*, 152 F.3d 729, 733 (7th Cir. 1998); *see also Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 405 (7th Cir. 1999) ("Doubling is the norm, not the exception.").

Defendants contend that O'Hara's testimony shows Specialty acted in good faith because Plaintiffs had complete independence to choose the number of hours they billed and Specialty never

---

[6] In Plaintiffs' amended damages calculation for Wenckaitis (Exhibit 38), Plaintiffs omitted from calculation any overtime wages owed for 9/14/19 to 9/27/19—a pay period in which Plaintiffs originally alleged Wenckaitis worked 30 overtime hours. The Court used Plaintiffs' Exhibit 38 (including this deletion) to reduce Wenckaitis' proposed overtime hours by an additional half hour for each Saturday worked.

[7] The FLSA and IMWL allows employers to credit some types of payments toward the amount of overtime wages owed to an employee. This includes compensation in excess of 1.5 times the established rate paid for work on Saturdays. 29 U.S.C. § 207(e)(6); 56 Ill. Admin. Code tit. 56 § 210.410. Because the Court concludes that Wenckaitis worked more than five hours on Saturdays for which he received eight-hours pay, he did not receive 1.5 times his established rate. Therefore, any excessive payments that may have resulted from this arrangement cannot be credited toward the overtime wages owed to Wenckaitis.

questioned Plaintiffs' calculations. This is not evidence of good faith—it is the employer's (and not the employee's) responsibility to ensure workers are properly compensated. Defendants additionally contend that Specialty's five-for-eight rule is evidence of good faith. As explained above, the five-for-eight rule was insufficient to properly compensate employees for overtime. Further, O'Hara testified that he implemented the rule to create an incentive to work on Saturdays. There is no evidence that he made affirmative steps to assess his FLSA compliance or that the five-for-eight rule was created with the intent to comply with his legal obligations. For these reasons, Defendants have not rebutted the strong presumption of liquidated damages under the FLSA and Plaintiffs are entitled to an additional equal amount of their lost overtime pay ($1,612.01 for Wenckaitis and $1,896.67 for Marshall).

Plaintiffs also seek statutory interest under the IMWL. Unlike the FLSA, the IMWL contains no good faith exception. *See Burton v. DRAS Partners, LLC*, No. 2019-CV-02949, 2019 WL 5550579, at *5 (N.D. Ill. Oct. 27, 2019) (Coleman, J.). Until February 19, 2019, the statute provided two percent per month penalty interest; thereafter, the law increased interest to five percent per month. *Compare* 820 ILCS 105/12(a) (2006) *with* 820 ILCS 105/12(a) (2019). According to Plaintiffs' damages formulas (P Ex. 38), which Defendants have not objected to, Wenckaitis is entitled to $6,633.86 in IMWL penalties and Marshall is entitled to $7,973.23 in IMWL penalties.

### B. IECA Statutory Penalties

"It is a violation of [the IECA] for an employer or entity not to designate an individual as an employee under Section 10 of this Act[.]" 820 ILCS 185/20. As established above, Plaintiffs were Specialty employees under the IECA. Therefore, Defendants violated the IECA for failure to designate Plaintiffs as employees. In a private action, the statute provides for $500 in compensatory damages for each violation of the IECA. 820 ILCS 185/60. The statutory text, however, does not define whether or how often a violation may reoccur. That is, if it is a violation to "designate" an

employee as an independent contractor, how often does this designation take place? Plaintiffs argue that Defendants violated the IECA each time they paid Plaintiffs as independent contractors. In support of this proposition, Plaintiffs cite to *Lizak v. Great Masonry, Inc.*, No. 08 CV 1930, 2009 WL 3065396 (N.D. Ill. Sept. 22, 2009) (Coar, J.). The court in that case classified each week of the plaintiff's employment as a new violation, though plaintiff only worked for the employer for two weeks. *Id.*, at *10. The court specifically noted that the "IECA is unclear as to whether violations should be calculated on a weekly basis, [but] this Court will grant Plaintiff's request based on its reasonability and Defendant's lack of response." *Id.* In contrast, in the present case, Defendants maintain that the IECA counts only one violation per plaintiff and argues that the *Lizak* defendant's failure to respond to the plaintiff's calculations renders the holding inapplicable here. Defendants do not cite to any additional authority in support of their position.

The disparity between the parties' damages calculations under the IECA is vast. Under Defendants' view, their damages would be limited to $500 per Plaintiff. Plaintiffs' proposed $500-per-pay-period calculation comes out to $13,500 for Marshall and $20,000 for Wenckaitis. But based on the text of the statute and the authority cited, the Court agrees that calculating damages based on the number of pay periods Defendants paid Plaintiffs as independent contractors is the reasonable interpretation of the statute. Though the IECA does not define the frequency of violations for which individuals can recover in a private suit, it elsewhere states that in the case of actions brought by the Department of Labor, "each violation of this Act for each person and for each day the violation continues shall constitute a separate and distinct violation." 820 ILCS 185/40. Because Section 40 allows for the recovery of multiple violations for each employee, the Court will not interpret Section 60 so narrowly to only count one violation for each Plaintiff. Further, the pay-period proposal aligns with the text of the statute, which states that a violation occurs when the employer fails to "designate" the worker as an employee. Each time Defendants

paid Plaintiffs, they effectively re-designated Plaintiffs as independent contractors by (among other things) failing to withhold taxes from their wages. Using Plaintiffs' proposed calculations, the Court awards statutory damages under the IECA in the amount of $13,500 for Marshall and $20,000 for Wenckaitis.

C. Unemployment Benefits

The IECA additionally allows recovery for unemployment benefits Plaintiffs would have received had Specialty classified them as employees, plus an equal amount in liquidated damages. *See* 820 ILCS 185/60(a). Specialty laid Plaintiffs off in March 2020, making them eligible for unemployment benefits. *See* 820 ILCS 405/500. Plaintiffs did not receive unemployment benefits because Specialty designated Plaintiffs as independent contractors and therefore failed to properly report their wages, as evidenced by the IDES denial letters. (P Ex. 25–26.) Marshall testified that he was unemployed for 23 weeks though he was able to work and actively looked for work. The evidence showed that Wenckaitis remained unemployed only for two weeks, though he previously alleged a longer term of unemployment. According to the IDES Weekly Benefit Table for 2020 and Plaintiffs' calculations, if Plaintiffs' applications for unemployment benefits had been approved, Wenckaitis would have received $669 per week and Marshall would have received $484 per week. (P Ex. 6.) This evidence is sufficient to show that Marshall would have received $11,132 in unemployment benefits for the 23 weeks he was unemployed and Wenckaitis would have received $1,338 for his two weeks of unemployment.

At trial and in their post-trial brief, Defendants argued that the Court must reduce Plaintiffs' damages for the lost unemployment benefits as Plaintiffs failed to mitigate their damages by appealing the IDES denial or applying for benefits under the CARES Act. However, "failure to mitigate damages is an affirmative defense under Illinois law." *Kensington Rock Island Ltd. P'ship v. Am. Eagle Historic Partners*, 921 F.2d 122, 125 (7th Cir. 1990). "An affirmative defense is waived

when it has been knowingly and intelligently relinquished and forfeited when the defendant has failed to preserve the defense by pleading it." *Burton v. Ghosh*, 961 F.3d 960, 965 (7th Cir. 2020) (citation omitted). Defendants never amended their pleading to add a mitigation defense and therefore it is waived. As a result, Plaintiffs are entitled to their lost unemployment benefits and an equal amount in liquidated damages ($22,264 for Marshall and $2,676 for Wenckaitis). *See* 820 ILCS 185/60(a)(1).

  D.  <u>Flex Fund</u>

   Next, Plaintiffs contend that Defendants violated the IWPCA for deducting $2 per hour from their wages for the flex fund. The IWPCA prohibits employers from making deductions from employees' wages unless they are "made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9. Wages are "defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece or any other basis of calculation." 820 ILCS 115/2. The pertinent inquiry here is whether the retention of the flex fund constituted a deduction in Plaintiffs' pay subject to the IWPCA. Under the Independent Contractor Agreement, the parties agreed to a set hourly rate "plus $2.00 per hour retained in flex fund." (P Ex. 12.) O'Hara stated that the flex fund served as a type of bonus. However, he also testified that the flex fund would only be released to employees if there were no issues with their work. The Independent Contractor Agreement is silent as to the necessary conditions for flex fund disbursement or the timing of the payouts.

   Based on the plain language of the statute and Defendants' use of the flex fund, the Court holds that the retention of $2.00 per paycheck served as a deduction of Plaintiffs' wages. First, the language of Independent Contractor Agreement represents the flex fund as part of Plaintiffs' total wages—"The cost to complete will be $33.50 per hour (full Journeyman scale) **plus** $2.00 per hour

retained in flex fund." (*Id.*) Additionally, O'Hara's description of the fund shows that the amount served as a penalty rather than a bonus. If a worker made an error on a job or did not meet standards, they did not receive part of their wages. Because the Court concludes that the extra $2.00 constituted a portion of Plaintiffs' wages, retention of those wages without prior written consent violated the IWPCA. Therefore, Plaintiffs are entitled to two percent "of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid." 820 ILCS 115/14(a).[8] Therefore, Marshall is entitled to $501.64 and Wenckaitis is entitled to $550.80 under the IWPCA.

E. <u>Individual Liability</u>

O'Hara argues that to the extent Specialty is liable for the above violations, he cannot be held personally liable as all action was taken through Specialty as a corporate entity. Courts interpreting the FLSA have held that a corporate officer who controls the corporation's operations is joint and severally liable for unpaid wages. *See Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 748 (N.D. Ill. 2011) (Kendall, J.) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991)). Courts have also found individual corporate officers who have "significant ownership interests [in the corporation], day-to-day control of operations, and involvement in the supervision and payment of employees" personally liable for FLSA violations. *Id.* (compiling cases). Under the IWPCA and IECA, corporate officers who knowingly permit violations of the statutes are deemed to be employers subject to liability. 820 ILCS 115/13 ("[A]ny officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation"); 820 ILCS 185/63 (same). Corporate officer liability attaches under the IMWL as

---

[8] The Court applies the two percent penalty as Defendants' deductions were made prior to the amendment to the IWPCA increasing the penalty to five percent. Ill. P.A. 102-50, eff. 7-9-21.

well, though Illinois courts have applied both the "knowingly permit" standard and the FLSA standard. *See, e.g., Foday v. Air Check, Inc.*, No. 15-cv-10205, 2018 WL 3970142, at *5 (N.D. Ill. Aug. 20, 2018) (Dow, J.) (describing the varied Illinois court approaches).

O'Hara describes Specialty as a "one man show," and testified that he alone runs the company. O'Hara was responsible for hiring and firing decisions and negotiated Plaintiffs' rates, including the flex fund deduction. All evidence shows that O'Hara controlled the corporation's operations and knowingly permitted the above violations. Because he was the decisionmaker for the actions that violated the above statutes, he "knowingly permitted" them to take place. *See Zwick v. Inteliquent, Inc.*, 83 F. Supp. 3d 804, 811 (N.D. Ill. 2015) (Durkin, J.). Thus, O'Hara is joint and severally liable for the above statutory violations.

III. *Counterclaim*

Finally, Defendants filed counterclaims against Plaintiffs for unjust enrichment. These claims were narrowed at trial. As it stands, Defendants seek $4,126 from Wenckaitis for an accidental double payment of his flex fund and $792 from Marshall for an advance given after the start of the pandemic. Defendants contend that Plaintiffs were unjustly enriched through these payments and that they must be returned. An unjust enrichment claim allows a means of recovery when an individual has retained a benefit to another's detriment and that retention "violates the fundamental principles of justice, equity, and good conscience." *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). But because unjust enrichment is based on an implied contract, "[w]hen the two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 571 (7th Cir. 2016). Unjust enrichment claims are barred in this instance "to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 689 (7th Cir. 2004).

Here, the parties entered into an agreement governing their rate of pay and the retention of the flex fund. Defendants now seek recovery of additional wages (which Defendants called an advance) because Plaintiffs did not provide labor in exchange for the payment. Such a claim is improper under an unjust enrichment theory and should have been brought as a breach of contract claim. *See Enger*, 812 F.3d at 571. Defendants' unjust enrichment claim for the flex fund overpayment nonetheless prevails. "In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions relating to the claim." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 689 (7th Cir. 2004). While the Independent Contractor Agreement covers the amount of flex fund wages to which Wenckaitis was entitled, it is silent on the issue of accidental overpayments. Therefore, the unjust enrichment claim on this issue is proper. Plaintiffs only additional argument is that the overpayment did not violate principles of justice, equity, or good conscience because Wenckaitis offered to repay the debt by working hours without additional pay, which O'Hara refused. The Court does not agree. The evidence showed that O'Hara accidentally made the overpayment, which Wenckaitis acknowledged retaining. Therefore, the Court finds that Defendants prevail on Count I of their counterclaim as to the flex fund overpayment only.

**Conclusion**

For these foregoing reasons, the Court directs the Clerk to enter judgment in favor of Plaintiff Wenckaitis and against Defendants in the amount of $34,696.69 (Count I, $1,612.01; Count II, $6,633.86; Count III, $550.80; and Count IV, $25,900.02). The Clerk shall enter judgment in favor of Plaintiff Marshall and against Defendants in the amount of $49,928.88 (Count I, $1,896.67; Count II, $7,973.23; Count III, $501.64; and Count IV, $39,557.34). Defendants prevail on Count I of their counterclaim, and judgment shall be entered against Plaintiff Wenckaitis in the amount of $4,126. Plaintiffs to file their petition for attorney fees and costs under the relevant statutes within

21 days after entry of judgment.

IT IS SO ORDERED.

Date: July 11, 2023                    Entered: _____
                                                SHARON JOHNSON COLEMAN
                                                United States District Judge